UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

VALERIA GIRIMONTE AND FLAVIA SANTANA,

      Plaintiff,

 - against -

MERGERMARKET, LTD,

      Defendant.

------------------------------------------------------------x

COMPLAINT

PLAINTIFFS DEMAND
A TRIAL BY JURY

    Plaintiff Valeria Girimonte ("Girimonte") and Flavia Santana ("Santana") (collectively "plaintiffs"), by their attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendant Mergermarket, Ltd. ("Mergermarket" or "defendant"), allege as follows:

## NATURE OF CLAIMS

    1. Plaintiffs bring this action to remedy unlawful discrimination on the basis of race in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); to remedy discrimination on the basis of sex for defendant's failure to pay male and female employees equal wages in violation of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"); to remedy discrimination on the basis of gender and pregnancy, national origin, race, and retaliation for opposing unlawful discrimination in violation of the Administrative Code of the City of New York § 8-107 et seq. (the "City Law"); to remedy defendant's failure to pay male and female employees equal wages in violation of New York State Labor Law ("Labor Law") § 194; and to remedy the unlawful deduction of wages in violation of Labor Law § 193(1).

653511 v1

## JURISDICTION AND VENUE

2. This Court has jurisdiction over plaintiffs' Section 1981 and EPA claims under 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over plaintiffs' City Law and Labor Law claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to the Section 1981 and EPA claims, and arise from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant regularly conducts business, and the unlawful practices complained of herein occurred, within the Southern District of New York.

5. Pursuant to § 8-502(c) of the City Law, plaintiffs, prior to filing this Complaint, served a copy of the Complaint on the Corporation Counsel of the City of New York.

## PARTIES

6. Girimonte is from Argentina. From July 2005 to February 2011, she lived in New York and worked full-time as a Sales Director and then as a Researcher at Mergermarket's New York office. She moved to California in early 2011 and continued to work for Mergermarket's San Francisco office until September 2013.

7. Santana is from Brazil and is a resident of New York City. From October 2006 to August 2014, she worked full-time as a Sales Director and then as Head of Sales for Latin America at Mergermarket.

8. Mergermarket is an international news-service that provides information on mergers and acquisitions. Mergermarket retains a staff of approximately 800 people and has offices in 65 locations throughout the world. It is headquartered in New York City.

9. Venue is proper in New York County because defendant resides in New York County.

## FACTUAL ALLEGATIONS

10. Girimonte joined Mergermarket as a Sales Director for Debtwire, a Mergermarket subdivision that specializes in distressed debt news, in July 2005. Girimonte holds a master's equivalent degree (Licenciatura) from the Universidad Argentina de la Empresa (UADE). She had a background in covering macro and international commerce trends and analyzing financial information.

11. Santana also joined as a Sales Director for Debtwire in October 2006. She holds a master's degree from St. Thomas Aquinas College and a bachelor's degree from Montclair State University. Prior to joining Mergermarket, Santana had a background in business management.

12. Both women reported to Jonathan Reed ("Reed"), a Managing Director.

### Sexual Harassment

13. Mergermarket fostered a "boys club" culture, where male supervisors regularly pursued romantic relationships with their female subordinates and were shielded from any resulting consequences.

14. Reed hired Girimonte in July 2005.

15. In mid-November 2005, during Girimonte's first business trip to Buenos Aires, Reed decided to go on vacation to the same city at the same time. On the trip, Reed and Girimonte began a sexual relationship.

16. In early 2006, Reed summoned Girimonte to his apartment to end the relationship after telling Girimonte that he "loved her to pieces."

3

17. While Girimonte found Reed's behavior to be an abuse of his authority as her supervisor, she believed that she would be retaliated against if she complained. Girimonte was aware that other male managers in the company openly had affairs with women they supervised. Based on her conversations with coworkers, she understood that these types of relationships were condoned, if not encouraged. Mergermarket management gave senior male employees the message that they were free to start and end intra-office relationships with subordinates as they pleased.

18. After their relationship ended, Reed became increasingly critical of Girimonte's performance. Even though her sales numbers remained high, he told her that she was "not cut out" to be a sales person. Under this pressure, Girimonte transferred from a sales position to a research position within Debtwire. She took a pay cut from $125,000 in total compensation to $60,000. Mergermarket has a practice of transferring female employees to different offices after relationships between male supervisors and female subordinates end.

19. In spring 2011, Reed made unwelcome advances toward Girimonte at a company party, to which she responded, "Not again."

20. In October 2006, Reed hired Santana as a Sales Director for Latin America. From 2007 to 2010, Reed regularly made comments to Santana about her attractiveness, telling her that she looked "fantastic" and remarked on the size of her breasts. When Santana received positive feedback from clients, Reed told her it was for her looks, not for her performance.

21. Reed often became intoxicated and touched Santana inappropriately. Mergermarket staff were expected to attend company parties, during which they were pressured to drink excessively. Employees that did not drink were labeled as "no fun" and alienated within

the office. Male employees were given license to sexually harass female coworkers at these events. On several occasions, Reed insisted on kissing Santana goodbye on the cheek but intentionally missed and kissed her mouth instead.

22. In April 2010, on the first night of a conference in Sao Paulo, Brazil, Reed asked Santana for her room number so he could use her computer. In her room, he opened a bottle of champagne and continually complimented Santana's appearance. He also mentioned several times that she should go to The Box, a venue that stages erotic performances.

23. In February 2011, Reed returned to Sao Paulo exclusively to attend meetings with Santana, who was responsible for Debtwire Latin America. The first night of his stay, Reed and Santana were at a hotel bar for their last meeting of the day. After the meeting Reed continued to buy Santana drinks, kissed her and told her that he had "always been attracted to her" and that she was his "girl." Because Reed was Santana's supervisor, she felt uncomfortable resisting his advances.

24. From February 2011 to June 2012, Reed and Santana had an intermittent affair, during which Reed singled Santana out for professional scrutiny.

25. Despite Santana's strong sales records and performance reviews, Reed frequently questioned her business decisions. He criticized her for being too outspoken at meetings and for challenging his authority.

26. In March 2011, Santana was promoted to Head of Sales for Latin America. Upon information and belief, Reed interfered with the promotion to make sure Santana, unlike the other, male, Heads of Sales, was not given any additional responsibilities.

5

653511 v1

27. After their affair ended in June 2012, Reed continued to pressure Santana for sexual favors. He asked her to reveal more cleavage and to spread her legs for him. He also told Santana that he could not talk to her in the hallway because she aroused him too much.

28. In December 2012 after the company's Christmas party, Reed met Santana at a bar where he kissed her and told her that he missed her and that she was "his girl." He then asked her to have sex with him in the bathroom. She refused.

29. Starting in mid-2011, Reed encouraged Santana to quit, telling her that she would be better off working in a smaller work environment or at a hedge fund in investor relations.

30. Santana became pregnant in July 2013. During most of Santana's pregnancy, Reed refrained from making inappropriate comments. After Santana returned from her maternity leave, however, Reed resumed commenting on her looks and making references to their sexual history. Santana found it difficult to remain in a professional environment with Reed, particularly because he was still her supervisor.

31. Just before Santana's last day of work, Reed and Santana met at a restaurant, after which Reed kissed and touched Santana. Reed's behavior was unwelcome and made Santana uncomfortable.

### Other Instances of Harassment and Retaliation

32. In addition to Reed, other male employees, including senior management, frequently behaved inappropriately toward female colleagues without reprimand. By contrast, female employees who resisted advances or expressed disapproval of Mergermarket's discriminatory culture of intra-office relationships were often punished.

653511 v1

33. Male employees in Mergermarket's New York and London offices, including members of senior management, circulated a "hot list," a list ranking the attractiveness of female colleagues. After joining in 2005, Girimonte was notified that her name was on the list. Santana learned about the list in 2007 through a male coworker in the London office.

34. In the fall of 2007, Santana reported an instance of sexual harassment in which a male colleague touched her butt without her permission at a company party. Upon information and belief, her co-worker never faced any discipline for this behavior.

35. Co-workers also regularly made reference to Santana's breast-size. For example, in August 2014 at Santana's going-away party, in group photos, a female Sales Director pretended to touch Santana's breasts without Santana's knowledge. Upon information and belief, no one has been disciplined for such comments or gestures.

36. In the fall of 2009, a male Sales Director at Debtwire showed a table full of co-workers a video of himself having sex with another woman. The male employees at the table laughed with approval. Santana and a female employee, also a Sales Director, were the only women present. Upon information and belief, the male employee was never disciplined.

37. In July 2014, a male employee in the Editorial department made crude remarks about the sexuality of Santana's newborn son. He said in substance, "It doesn't matter if he turns out to be gay or not, he will have an erection by looking at a disgusting male math teacher because that is how men are." Although most of the sales team, including Brian Fitzgerald ("Fitzgerald"), Head of Sales America, was present, Santana was the only one who showed discomfort. Upon information and belief, the male employee was never disciplined.

38. This kind of behavior extended to Mergermarket's Chief Executive Officer ("CEO"), Hamilton Matthews ("Matthews"). In spring 2011, at a company karaoke party in a

dimly-lit room, Matthews rubbed Santana's legs and touched Girimonte inappropriately. He also grabbed the breasts of another Sales Director who later told Girimonte that Matthews's behavior was not welcome. The Sales Director complained to Jonathan Reed that Matthews had too much to drink. Reed asked her if she could "handle it," to which she replied "yes"; she later left the party. Later in the evening, Girimonte found Matthews kissing a female employee from the marketing department. Girimonte left the party immediately. The next day the female employee told Girimonte that she had spent the night with Matthews in his hotel room.

39. After the 2011 karaoke party, Girimonte started to receive negative feedback, despite a very positive performance history. Although Girimonte continued to register revenue growth, members of management said they were concerned she was not "bringing enough value." Marc Katz ("Katz"), a Managing Director, asked Gabriel De Sanctis, Debtwire's Emerging Markets Editor, whether Girimonte was "really needed." Katz also asked Santana whether Girimonte's work was essential to the company.

Pregnancy Discrimination

40. Mergermarket penalized female employees for taking maternity leave by reducing their compensation and responsibilities.

41. Girimonte became pregnant in early 2012. She gave birth to her son on Christmas Day 2012 and took maternity leave in winter 2012 to 2013.

42. In January 2013, Girimonte was informed that she did not receive a bonus for the year of 2012 in spite of excellent mid-year and year-end performance reviews. Girimonte was also informed that her supervisor had changed without explanation from John Brokos ("Brokos") to Howard Tang ("Tang"). She learned of this change only after inquiring about her bonus.

43. When Girimonte asked Tang whether her bonus had been miscalculated, Tang confirmed that her bonus was zero. Tang was surprised at the number given Girimonte's 2012 performance. Brokos also confirmed that she did not earn a bonus for 2012.

44. Girimonte also was not paid in accordance with the revenue sharing agreement that she had negotiated with Matthews and Jonathan Gomer ("Gomer"), Mergermarket's Chief Financial Officer ("CFO"), in 2011.

45. At the end of January 2013, Girimonte emailed Gomer and Reed to complain about discrimination, alleging that Mergermarket was discriminating against her for her pregnancy and maternity leave.

46. Gomer claimed that Girimonte's bonus and revenue sharing compensation were withheld due to a "mistake" and that she was "overreacting." Despite this, Mergermarket did not pay her immediately. Girimonte had to continue negotiating the correct amount of her bonus and revenue share with her managers over the course of a month while she was still on maternity leave. Although her bonus was eventually dispensed, she did not receive full payment of her revenue share. Girimonte also did not receive the full amount of her revenue share in 2011.

47. When Girimonte returned to work in April 2013, her supervisors expressed increasing dissatisfaction with her work. Ken Meehan ("Meehan"), the Editor in Chief of Debtwire, called Girimonte a "loose cannon," referring to what he suggested were emotional and hormonal imbalances after Girimonte's pregnancy.

48. In July 2013, Mergermarket directed Girimonte to fire her entire research team in Argentina.

49. By mid-2013, Girimonte understood that Mergermarket had been laying the groundwork to fire her.

50. Girimonte resigned her position in September 2013.

51. Not only did Mergermarket pressure Girimonte to leave, but it also retaliated against her once she quit. In October 2013, Girimonte started a new company, a news service specializing in reporting on distressed debt in Latin America. Girimonte was not bound by any covenant not to compete or non-solicitation agreement. Despite this, Mergermarket threatened Girimonte with frivolous breach of contract claims.

52. Mergermarket continues to retaliate against Girimonte by threatening similar litigation against Santana, a recent employee of the new company. When Santana resigned, Fitzgerald told her that he would "hunt her down" if she began working with Girimonte at the new company.

53. From April to June 2014, Santana took maternity leave. During her time away, she understood her accounts would be temporarily overseen by her co-worker, Pablo Lopez ("Lopez"). Although Santana preferred to take a longer leave, especially in light of post-delivery medical complications, she returned to work 10 weeks after giving birth because she feared that some of her accounts might be taken away from her. Santana was informed by two coworkers that Lopez aggressively pursued Santana's accounts and continually asked them whether Santana would return from maternity leave. Lopez received preferential treatment from Fitzgerald, one of Santana's supervisors.

54. Nevertheless, despite taking a relatively short leave, Santana found that many of her accounts were indefinitely transferred to Lopez when she returned. For two of

10

653511 v1

Santana's trial accounts that eventually became permanent when she was on leave, all the commissions went to Lopez.

## Unequal Compensation Based on Gender

55. Girimonte and Santana were compensated less and given fewer resources and responsibilities than their male colleagues because of their gender.

56. When Girimonte joined Mergermarket in 2005 as Sales Director, she was paid $60,000 in base salary, approximately $20,000 less than her male colleagues. When Santana joined in 2006, she was paid $69,000, over $10,000 less than her male colleagues. Girimonte and Santana were the only female Sales Directors in the Latin America department.

57. After Santana was promoted to Head of Sales for Latin America in March 2011, she was not given the same resources or responsibilities as male employees with the same positions. Unlike her male colleagues, she was not given a corporate credit card, a corporate mobile phone or a budget to expand her team. The Mergermarket website did not even list Santana as Head of Sales, and displayed instead an all male team. She was also not paid on other team member sales as other Head of Sales were.

58. Since starting at Debtwire, Santana more than doubled the clientele for her Latin America group. In 2007, she was one of best salespersons globally. From 2008 to 2013, she remained one of the top five to 10 salespersons within the entire company. In 2011 and 2013, she was officially named one of the best salespersons in the United States. She increased her book of business from $1 million to almost $4 million in sales. Her sales effort generated more than $22 million over the past eight years.

59. In 2011, Mergermarket distributed the majority of Santana's book of business, which she had spent five years building, to Ralph Morales ("Morales"), a former Client

Relations Manager with no sales experience. Although Reed and Katz both admitted to Santana that she was "a hundred times" better than Morales as a sales person, they did not reinstate her accounts or territory.

60. By 2014, when more of Santana's accounts were assigned to a male colleague following her maternity leave, Santana understood that she was being pushed to quit.

61. In August 2014, Santana resigned her position and started working at Girimonte's new company. She left behind a book of business worth approximately $4.2 million because she could no longer endure the pressure, harassment and the work environment that Mergermarket cultivated.

62. Mergermarket initially agreed to pay Santana her commissions for the three months following her departure. Defendant has a practice of paying employees their commissions after they resign, and generally allows a much longer period of commission collection for former employees. In one example, an employee who resigned got paid all commissions up front.

63. In late September 2014, Mergermarket deposited a portion of Santana's commissions pursuant to their agreement. Moments later, however, Mergermarket withdrew the amount.

64. In fall 2014, Mergermarket also threatened frivolous litigation against Santana for breach of contract in order to intimidate her. As with Girimonte, Mergermarket put pressure on Santana to quit and then retaliated against her once she did.

### Unequal Compensation Based on National Origin and Race

65. Girimonte and Santana were also paid less than their colleagues because they are Latina and from Latin America.

653511 v1

66. In or around 2006, Girimonte was put in charge of two research teams, one comprised primarily of Argentinean employees based in Buenos Aires and one comprised primarily of Eastern European employees based in London. Even though Girimonte's teams were the highest producing within Debtwire, research teams staffed with Western European employees were paid more.

67. In October 2010, Girimonte complained to Reed that her teams were not being treated equally to Western European research teams operating in the same geographical location. Upon information and belief, Girimonte's complaint of discrimination was never addressed.

68. In April 2012, Santana complained to Fitzgerald that Mergermarket exercised protectionism in favor of its American employees. She told him that American employees were given greater professional support and business opportunities. Upon information and belief, Santana's complaint of discrimination was never investigated.

69. Additionally, co-workers often made derisive comments about Girimonte's and Santana's accents.

70. Reed told Girimonte repeatedly, "I don't understand a word you are saying," even though Girimonte speaks English with a high degree of fluency. In or around June 2013, when a client praised Girimonte's performance to Reed, he joked that he "did not understand a single word [she] said in her job interview."

71. On several occasions, a British co-worker asked Girimonte to say certain words with the letters "v" or "b" in them, highlighting the fact that in Latin America, the letters are pronounced very similarly. When she would say these words, the co-worker, and other staff members within earshot, would laugh.

72. While Mergermarket discriminated against its female employees generally, it treated Latina women worse, in terms of compensation and harassment, than their Western European and American counterparts.

## FIRST CAUSE OF ACTION

### Discrimination Under Section 1981

73. Plaintiffs repeat and reallege paragraphs 1 to 72 above.

74. By the acts and practices described above, defendant discriminated against plaintiffs on the basis of race under Section 1981.

75. Defendant knew that its actions constituted unlawful discrimination and/or acted with malice or reckless disregard for plaintiffs' statutorily protected rights.

76. Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

### Discrimination Under the EPA

77. Plaintiffs repeat and reallege paragraphs 1 to 76 above.

78. By the acts and practices described above, defendant, in violation of the EPA, has discriminated against plaintiffs by paying male employees higher wages than plaintiffs were paid for equal work in jobs that required equal skill, effort, and responsibility, and that were performed under similar working conditions.

79. Defendant knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for plaintiffs' statutorily protected rights.

653511 v1

80. Plaintiffs suffered lost wages as a result of defendant's willful and unlawful conduct.

### THIRD CAUSE OF ACTION

### Discrimination Under the City Law

81. Plaintiffs repeat and reallege paragraphs 1 to 80 above.

82. By the acts and practices described above, defendant discriminated against plaintiffs in the terms and conditions of their employment in violation of the City Law.

83. Plaintiffs have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

### FOURTH CAUSE OF ACTION

### Retaliation Under the City Law

84. Plaintiffs repeat and reallege paragraphs 1 to 83 above.

85. By the acts and practices described above, defendant discriminated against plaintiffs in the terms and conditions of their employment in violation of the City Law.

86. Plaintiffs have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

### FIFTH CAUSE OF ACTION

### Wage Reduction Under Labor Law

87. Plaintiffs repeat and reallege paragraphs 1 to 86 above.

653511 v1

88. By the acts described above, defendant failed to pay plaintiffs the full amount of their commissions and other compensation, thereby unlawfully reducing their wages in violation of Labor Law § 193(1).

89. Defendant's failure to pay plaintiffs their full wages was "willful" within the meaning of Labor Law § 198(1-a).

## SIXTH CAUSE OF ACTION

### Unequal Pay Under the Labor Law

90. Plaintiffs repeat and reallege paragraphs 1 to 89 above.

91. By the acts and practices described above, defendant has discriminated against plaintiffs by paying male employees higher wages than plaintiffs were paid for equal work in a job, the performance of which required equal skill, effort, and responsibility, and that was performed under similar working conditions, in violation of the New York State Labor Law.

92. Defendant knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for plaintiffs' statutorily protected rights.

93. Plaintiffs suffered lost wages as a result of defendant's willful and unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

a. enjoin and permanently restrain defendant from violating Section 1981, the EPA, the City Law and the New York Labor Law;

b. award plaintiffs all earnings they would have received but for defendant's discrimination and retaliation;

      c.      award plaintiffs the amount of the wages improperly withheld in violation of the New York Labor Law;

      d.      award plaintiffs liquidated damages pursuant to New York Labor Law § 198;

      e.      award plaintiffs attorneys' fees, costs and disbursements, pursuant to 42 U.S.C. § 1988, the EPA, the City Law and New York Labor Law;

      f.      award plaintiff's compensatory damages for their emotional distress, pain and loss of reputation;

      g.      award plaintiffs punitive damages;

      h.      award plaintiffs damages to compensate for any adverse tax consequences;

      i.      award prejudgment interest; and

      j.      award plaintiffs such additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated: New York, New York
       January 30, 2015

                          VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.

By: _____
        Anne L. Clark
        Ming-Qi Chu
        Attorneys for Plaintiff
        1501 Broadway, Suite 800
        New York, New York 10036
        (212) 403-7300